Tom **SWANNER, d/b/a Whitehall Properties, Appellant,**

v.

**ANCHORAGE EQUAL RIGHTS COMMISSION, Paul L. Connerty, Executive Director, ex rel. Joseph Bowles, William F. Harper, and Dee Moose, Appellees.**

No. S–5362.

Supreme Court of Alaska.

May 13, 1994.

---

Stephen S. DeLisio, Staley DeLisio & Cook, Anchorage, for appellant.

Constance E. Livsey, Faulkner, Banfield, Doogan & Holmes, Anchorage, for appellees.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

On consideration of the petition for rehearing, filed on February 25, 1994, and the response, filed on March 14, 1994,

IT IS ORDERED:

1. The petition for rehearing is GRANTED.

2. The majority opinion, Opinion No. 4049, published on February 11, 1994, is WITHDRAWN.

3. Opinion No. 4081 is issued on this date in its place.

4. The major modifications in the opinion follow:

Editor's Note: Modifications incorporated for purposes of publication.

(c) The modified majority opinion on rehearing will be issued as a Per Curiam opinion since former Justice Burke did not participate in the court's consideration of the petition for rehearing.

Entered by direction of the Court at Anchorage, Alaska, on May 13, 1994.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

*OPINION*

PER CURIAM.

Swanner, d/b/a Whitehall Properties, appealed the superior court's decision which affirmed the Anchorage Equal Rights Commission's (AERC) order that Swanner's policy against renting to unmarried couples constituted unlawful discrimination based on marital status. Swanner disputes the decision and contends that enforcing the applicable statute and municipal ordinance violates his constitutional right to free exercise of his religion under the United States and Alaska Constitutions. Swanner claims the AERC deprived him of due process by adopting the hearing examiner's recommended decision and proposed order without itself conducting an independent review of the case on its merits and by failing to notify him that it would do so.

We hold that Swanner discriminated against the potential tenants based on their marital status. We further hold that enforcing the fair housing laws does not deprive him of his right to free exercise of his religion. The proceedings of the AERC did not deprive Swanner of his right to due process of law. We affirm the AERC and superior court decisions.

I. *FACTS AND PROCEEDINGS BELOW*

Joseph Bowles, William F. Harper, and Dee Moose filed three separate complaints of marital status discrimination in the rental of real property in Anchorage. The complainants alleged that Tom Swanner, doing business as Whitehall Properties, violated municipal and state anti-discrimination laws, Anchorage Municipal Code (AMC) 5.20.020 and AS 18.80.240. Swanner refused to rent or allow inspection of residential properties after learning that each complainant intended

to live with a member of the opposite sex to whom he or she was not married.

While Swanner did not specifically recall having conversations with Bowles, Harper, or Moose, he readily admitted having a policy of refusing to rent to any unmarried couple who intend to live together on the property. Swanner's refusal to rent or show property to unmarried couples is based on his Christian religious beliefs. Under Swanner's religious beliefs, even a non-sexual living arrangement by roommates of the opposite sex is immoral and sinful because such an arrangement suggests the appearance of immorality. It is undisputed that Swanner rejected each complainant as a tenant because of this policy and for no other reason.

### A. Proceedings Before the Anchorage Equal Rights Commission

The AERC consolidated the three cases for hearing and appointed Robert W. Landau as hearing examiner on April 6, 1990. Landau conducted a hearing on October 9 and 11, 1990 and issued a twenty-five page Recommended Decision and proposed order in favor of the complainants on January 7, 1991. He served the recommended decision to Swanner's counsel and the AERC on January 7, 1991.

Pursuant to the AERC's administrative rules of procedure in effect at the time, each party had ten days after receipt of the recommended decision to submit written objections. AMC 5.10.015(A). When the AERC receives objections, the regulations provide for its review of the record and modification of the recommended decision where appropriate. AMC 5.10.015(B). If the parties fail to object, the proposed decision automatically becomes final. AMC 5.10.015(A). Neither Swanner nor the AERC submitted written objections. On January 23, 1991, the AERC issued a memorandum stating that, pursuant to AMC 5.10.015(A), the parties' failure to object to the hearing examiner's recommended decision resulted in his proposed order becoming final on January 22, 1991. On January 31, 1991, Cheri C. Jacobus, AERC Chairperson, issued a Notice of Final Order which affirmed that the proposed order became final on January 22, 1991.

### B. Proceedings Before the Superior Court

Swanner appealed to the superior court on March 8, 1991. Judge Karen L. Hunt heard oral argument on May 15, 1992 and issued a written decision and order on August 31, 1992. She affirmed the AERC's decision, holding that (a) Swanner's conduct constituted unlawful discrimination based upon marital status; (b) enforcement of the state and municipal anti-discrimination laws does not violate Swanner's constitutional rights, pursuant to the U.S. Supreme Court's decision in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), and our decisions in *Frank v. State*, 604 P.2d 1068 (Alaska 1979) and *Seward Chapel, Inc. v. City of Seward*, 655 P.2d 1293 (Alaska 1982); and (c) the automatic finalization of the AERC's decision did not violate Swanner's due process rights.

### C. Proceedings Before This Court

Swanner appealed to this court on September 18, 1992. He contends that the superior court erred in finding that he discriminated against the complainants on the basis of marital status. He claims that he does not discriminate based on marital status, but even if he does, he is excused from compliance with the anti-discrimination laws because of his fundamental right to the free exercise of his religion, guaranteed by the Alaska and United States Constitutions. He also claims that the automatic finalization of the AERC's decision violates his due process rights under the Alaska and United States Constitutions.[1]

---

**1.** Each issue involves the interpretation and construction of laws and regulations. On questions of law arising on appeal which do not involve particularized agency expertise, this court applies its independent judgment. *Kodiak Island Borough v. State of Alaska, Dep't of Labor*, 853 P.2d 1111, 1113 (Alaska 1993); *Alaska Transp. Comm'n v. Airpac, Inc.*, 685 P.2d 1248, 1252 (Alaska 1984). Thus, as the superior court found and both parties agree, the substitution of judgment standard is the appropriate standard of review on the issues Swanner has raised.

## II. DISCUSSION

### A. Swanner Violated AMC 5.20.020 and AS 18.80.240 by Discriminating Based on Marital Status

■ Swanner argues that he does not discriminate against individuals based on their marital status because he will rent to people who are single, married, widowed, divorced, or separated. However, he will not rent to those whom he expects will engage in conduct repugnant to his religious beliefs, namely cohabitation outside of marriage. Swanner considers such cohabitation to be fornication and immoral.

The AERC responds that the laws at issue do not recognize a distinction between "marital status" and "cohabitation." The AERC claims the statutes' plain language demonstrates that "marital status" includes cohabitating couples.

In *Foreman v. Anchorage Equal Rights Comm'n*, 779 P.2d 1199, 1201–03 (Alaska 1989), we looked at the plain language of AS 18.80.240 [2] and AMC 5.20.020 [3] and reviewed the intent behind the anti-discrimination laws. In *Foreman*, a landlord who refused to rent to an unmarried couple argued that the laws did not protect the interests of unmarried couples. *Id.* at 1201. We held that the landlord's policy against renting to unmarried couples unlawfully discriminated on the basis of marital status. *Id.* at 1203. We reasoned that because the landlord would have rented to the prospective tenants had they been married, and he refused to rent the property only after learning the couple was not married, "[t]his constitutes unlawful discrimination based on marital status." *Id.* The same reasoning applies here. Because Swanner would have rented the properties to the couples had they been married, and he refused to rent the property only after he learned they were not, Swanner unlawfully discriminated on the basis of marital status. [4]

2. Alaska Statute 18.80.240 states:
Unlawful practices in the sale or rental of real property. It is unlawful ...
(1) to refuse to sell, lease, or rent the real property to a person because of sex, marital status, changes in marital status,
....
(3) to make a written or oral inquiry or record of the sex, marital status, changes in marital status ... of a person seeking to buy, lease or rent real property;
....
(5) to represent to a person that real property is not available for inspection, sale, rental, or lease when in fact it is so available, or to refuse to allow a person to inspect real property because of the ... marital status, change in marital status ... of that person....

3. AMC 5.20.020 provides:
Except in the individual home wherein the renter or lessee would share common living areas with the owner, lessor, manager, agent or other person, it is unlawful ...
A. To refuse to ... rent the real property to a person because of ... marital status ...;

C. To make a written or oral inquiry or record of the ... marital status ... of a person seeking to ... rent real property;

E. To represent to a person that real property is not available for inspection ... [or] rental ... when in fact it is available, or to refuse a person the right to inspect real property, because of the ... marital status ... of that person ...;

4. Swanner agrees that the laws at issue forbid discrimination on the basis of marital status. However, he contends that he did not discriminate against anyone on the basis of his or her marital status. Instead, he asserts that he discriminates on the basis of conduct, which is not prohibited by the statutes.

The definition of "cohabit" demonstrates that marital status and conduct are inextricably combined. "Cohabit" means "to live together in a sexual relationship when not legally married." *The American Heritage Dictionary* 259 (1980). Swanner cannot reasonably claim that he does not rent or show property to cohabitating couples based on their conduct (living together outside of marriage) and not their marital status when their marital status (unmarried) is what makes their conduct immoral in his opinion. The undisputed facts demonstrate that Swanner would have rented to the prospective tenants if they were married. Swanner's argument that he discriminated against the prospective tenants based on their conduct and not their marital status is without merit.

B. *Enforcement of AMC 5.20.020 and AS 18.80.240 Does Not Violate Swanner's Constitutional Right to the Free Exercise of His Religion Under the United States Constitution*

Swanner contends that enforcement of AMC 5.20.020 and AS 18.80.240 against him has a coercive effect on the free exercise of his religious beliefs. He believes that compliance with these laws forces him to choose between his religious beliefs and his livelihood. He requests that we accommodate his religious beliefs by creating an exemption to the statute and ordinance. The AERC responds that "it is not Swanner's religious beliefs *per se* which run afoul of our anti-discrimination laws, but rather his actions and conduct in a commercial setting."

■ The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; ..." U.S. Const. amend. I. The Free Exercise Clause applies to the states by its incorporation into the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). It grants absolute protection to freedom of belief and profession of faith, but only limited protection to conduct dictated by religious belief. *See Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (narrowing the scope of religious exemptions under the Free Exercise Clause by upholding a statute that crimi-

nalized peyote use, as applied to Native American religious ceremonies).

■ Swanner claims that we should apply the "compelling state interest" test set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), to determine whether the laws at issue violate his right to free exercise of religion under the United States Constitution.[5] However, in *Smith*, the United States Supreme Court expressly rejected applying the *Sherbert* test where the law being challenged is generally applicable, or, in other words, where the law is not directed at any particular religious practice or observance.[6] *Smith*, 494 U.S. at 885, 110 S.Ct. at 1603. "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye v. City of Hialeah*, —— U.S. ——, ——, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993) (citing *Smith*, 494 U.S. 872, 110 S.Ct. 1595 (1990)).[7] "Neutrality and general applicability are interrelated.... [F]ailure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at ——, 113 S.Ct. at 2226.

■ The first step in determining whether a law is neutral is whether it discriminates on its face. "A law lacks facial neutrality if it refers to a religious practice without a secu-

5. Under this balancing test, a law that incidentally burdens a religious practice must be justified by a compelling governmental interest. *See Sherbert*, 374 U.S. at 403, 406, 83 S.Ct. at 1793–94, 1795.

6. The Court stated:
   We conclude today that the sounder approach, and the approach in accord with the vast majority of our precedents, is to hold the test inapplicable to such challenges. The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's inter-

est is "compelling"—permitting him, by virtue of his beliefs, "to become a law unto himself,"—contradicts both constitutional tradition and common sense.
494 U.S. at 885, 110 S.Ct. at 1603 (citations and footnote omitted).

7. In *Church of Lukumi Babalu Aye v. City of Hialeah*, —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the Court used the Free Exercise Clause to strike down city ordinances that regulated animal sacrifice, but effectively prohibited only sacrifice practices of the Santeria religion. The Court held the ordinances failed to satisfy the *Smith* requirements because they were not neutral, generally applicable, nor narrowly tailored, and did not advance compelling governmental interests.

lar meaning discernable from the language or context." *Id.* at ——, 113 S.Ct. at 2227. Neither the ordinance nor the statute contain any language singling out any religious group or practice.

Even when a law is facially neutral, however, it may not be neutral if it is crafted to impede particular religious conduct. *Id.* These laws clear that hurdle as well. The purpose of AMC 5.20.020 and AS 18.80.240 is to prohibit discrimination in the rental housing market.[8] Swanner does not claim that the purpose of the laws is to discriminate against people based on religion; in fact, he contends that the laws do not even cover this kind of discrimination. Therefore, the laws satisfy the requirement of neutrality.

Additionally, these laws are generally applicable. They apply to all people involved in renting or selling property, and do not specify or imply applicability to a particular religious group. Therefore, at least under the general rule, no compelling state interest is necessary.

*Smith* provides one ground for judicial exemptions from compliance with neutral laws of general applicability. A court may exempt an individual from a law where the facts present a hybrid situation where an additional constitutionally protected right is implicated. *Smith,* 494 U.S. at 881–82, 110 S.Ct. at 1601–02. Like the appellant in *Smith,* Swanner does not contend that the laws in question here infringe on any constitutional right other than his right to free exercise of reli-

gion. Consequently, this case does not present such a "hybrid" situation.

■ We conclude that enforcing AMC 5.20.020 and AS 18.80.240 against Swanner does not violate his right to free exercise of religion under the United States Constitution.[9]

C. *Enforcement of AMC 5.20.020 and AS 18.80.240 Does Not Violate Swanner's Constitutional Right to the Free Exercise of His Religion Under the Alaska Constitution*

Swanner does not dispute that the ordinance and statute are generally applicable and neutral under *Smith,* but asserts that "this decision does not mandate use of a less restrictive standard by state courts in interpreting state constitutional protection."

■ Swanner is correct in asserting that a state court may provide greater protection to the free exercise of religion under the state constitution than is now provided under the United States Constitution. *See, e.g., Roberts v. State,* 458 P.2d 340, 342 (Alaska 1969) ("We are not bound in expounding the Alaska Constitution's Declaration of Rights by the decisions of the United States Supreme Court, past or future, which expound identical or closely similar provisions of the United States Constitution."). Thus, even though the Free Exercise Clause of the Alaska Constitution is identical to the Free Exercise Clause of the United States Constitution, we are not required to adopt and apply the

8. Alaska Statute 18.80.200 states the purpose of the anti-discrimination laws:

(a) It is determined and declared as a matter of legislative finding that discrimination against an inhabitant of the state because of race, religion, color, national origin, age, sex, physical or mental disability, marital status, changes in marital status, pregnancy or parenthood is a matter of public concern and that this discrimination not only threatens the rights and privileges of the inhabitants of the state but also menaces the institutions of the state and threatens peace, order, health, safety and general welfare of the state and its inhabitants.

(b) Therefore, it is the policy of the state and the purpose of this chapter to eliminate and prevent discrimination in employment, in credit and financing practices, in places of public accommodation, in housing accommodations and in the sale, lease, or rental of real property

because of race, religion, color, national origin, sex, age, physical or mental disability, marital status, changes in marital status, pregnancy or parenthood.

9. Shortly before the publication of this opinion, the United States Congress passed the Religious Freedom Restoration Act of 1993, 107 Stat. 1488 (1993). That act replaced the *Smith* test with the compelling interest test. Assuming that the Act is constitutional and applies to this case, it does not affect the outcome, because we hold in the next section that compelling state interests support the prohibitions on marital status discrimination. The most effective tool the state has for combatting discrimination is to prohibit discrimination; these laws do exactly that. Consequently, the means are narrowly tailored and there is no less restrictive alternative.

*Smith* test to religious exemption cases involving the Alaska Constitution merely because the United States Supreme Court adopted that test to determine the applicability of religious exemptions under the United States Constitution. We will apply *Frank v. State*, 604 P.2d 1068 (Alaska 1979), to determine whether the anti-discrimination laws violate Swanner's right to free exercise under the Alaska Constitution.[10]

In *Frank v. State*, we adopted the *Sherbert* test to determine whether the Free Exercise Clause of the Alaska Constitution requires an exemption to a facially neutral law.[11] 604 P.2d at 1070. We held that to invoke a religious exemption, three requirements must be met: (1) a religion is involved, (2) the conduct in question is religiously based, and (3) the claimant is sincere in his/her religious belief. *Id.* at 1071 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533–34, 32 L.Ed.2d 15 (1972)). Once these three requirements are met, "[r]eligiously impelled actions can be forbidden only 'where they pose some substantial threat to public safety, peace or order,' or where there are competing governmental interests 'of the highest order and ... [are] not

otherwise served....' " *Seward Chapel, Inc. v. City of Seward*, 655 P.2d 1293, 1301 n. 33 (Alaska 1982) (quoting *Frank*, 604 P.2d at 1070).

Swanner clearly satisfies the first and third requirements to invoke an exception to the laws under the Free Exercise Clause. No one disputes that a religion is involved here (Christianity), or that Swanner is sincere in his religious belief that cohabitation is a sin and by renting to cohabitators, he is facilitating the sin. However, the superior court held that he did not meet the second requirement that his conduct was religiously based because "[n]othing in the record permits a finding that refusing to rent to cohabiting unmarried couples is a religious ritual, ceremony or practice deeply rooted in religious belief." Swanner's claim that the superior court misinterpreted *Frank v. State* as limiting free exercise rights only to ritual or ceremony has merit. In *Frank*, we determined that the action at issue was a practice deeply rooted in religion. 604 P.2d at 1072–73. However, we did not intend to limit free exercise rights only to actions rooted in religious rituals, ceremonies, or practices. To

**10.** Swanner notes that two jurisdictions have held that a landlord may refuse to rent to unmarried couples because of his/her religious beliefs. He cites to decisions from Minnesota and California for the proposition that enforcement of the anti-discrimination laws against him violates his right to free exercise. In *Minnesota v. French*, 460 N.W.2d 2 (Minn.1990), the Minnesota Supreme Court held that a landlord's refusal to rent to an unmarried couple did not violate Minnesota's anti-discrimination laws and enforcing such laws would violate the landlord's free exercise right. However, in *French*, the anti-discrimination laws at issue did not define or otherwise explain the term "marital status." The court concluded that the Minnesota Legislature did not intend to include unmarried couples in the definition. *Cf. Foreman*, 779 P.2d at 1203 (holding unmarried couples are included within the state and municipal prohibitions against discrimination based on marital status). Moreover, the Minnesota court relied on the criminal anti-fornication statute then in effect. In contrast, Alaska's fornication provision was repealed well before the discriminatory conduct giving rise to this case occurred. *Compare French*, 460 N.W.2d at 10, *with Foreman*, 779 P.2d at 1202. Further, the *French* court relied on the Minnesota Constitution, article I, section 16, which contains very

different language from the Alaska Constitution. *See French*, 460 N.W.2d at 9.

In *Donahue v. Fair Employment Housing Comm'm*, 2 Cal.Rptr.2d 32 (Cal.App.1991), *review granted and opinion superseded*, 5 Cal. Rptr.2d 781, 825 P.2d 766 (Cal.1992), *review dismissed as improvidently granted and remanded*, 23 Cal.Rptr.2d 591, 859 P.2d 671 (Cal.1993), the California Court of Appeal held that although the landlords' conduct did constitute prohibited marital status discrimination, the landlords were entitled to an exemption from the anti-discrimination laws because of their religious beliefs. The court based its decision "on independent state constitutional grounds." 2 Cal.Rptr.2d at 40. However, the California Supreme Court depublished the court of appeal's opinion, thereby rendering the decision uncitable.

Neither case provides this court with meaningful guidance in interpreting the Free Exercise Clause of the Alaska Constitution.

**11.** In *Seward Chapel, Inc. v. City of Seward*, this court held, "Our ruling in *Frank* establishes that there are situations in which the Alaska Constitution requires the state or a municipality to except from a facially neutral law persons whose religious beliefs dictate that they not comply with the law." 655 P.2d 1293, 1301 (Alaska 1982) (footnote omitted).

meet the second requirement, a party must demonstrate that the conduct in question is religiously based; this determination is not limited to actions resulting from religious rituals. Swanner's refusal to rent to unmarried couples is not without an arguable basis in some tenets of the diverse Christian faith, and therefore, his conduct is sufficiently religiously based to meet our constitutional test. Although Swanner meets the three preliminary requirements to invoke an exception to the anti-discrimination laws, the analysis does not end here.

As discussed previously, a religious exemption will not be granted if the religiously impelled action poses "some substantial threat to public safety, peace or order or where there are competing state interests of the highest order." *Frank*, 604 P.2d at 1070. The question is whether Swanner's conduct poses a threat to public safety, peace or order, or whether the governmental interest in abolishing improper discrimination in housing outweighs Swanner's interest in acting based on his religious beliefs.

In our view, the second part of the test adopted in *Frank* is applicable here. Under this part of the *Frank* test, we must determine whether "a competing state interest of the highest order exists." "The question is whether that interest, or any other, will suffer if an exemption is granted to accommodate the religious practice at issue." *Frank*, 604 P.2d at 1073. The government possesses two interests here: a "derivative" interest in ensuring access to housing for everyone, and a "transactional" interest in preventing individual acts of discrimination based on irrelevant characteristics. Most free exercise cases, including *Frank*, involve "derivative" state interests. In other words, the State does not object to the particular activity in which the individual would like to engage, but is concerned about some other variable that the activity will affect. This can be contrasted with a "transactional" interest in which the State objects to the specific desired activity itself.

For example, in *Frank*, this court exempted a Central Alaska Athabascan Indian needing moose meat for a funeral potlatch from state hunting regulations. The State did not

object to killing moose per se (indeed, it expressly allows moose hunting in season); the State's derivative interest was in maintaining healthy moose populations. In the instant case, the government's derivative interest is in providing access to housing for all. One could argue that if a prospective tenant finds alternative housing after being initially denied because of a landlord's religious beliefs, the government's derivative interest is satisfied. However, the government also possesses a transactional interest in preventing acts of discrimination based on irrelevant characteristics regardless of whether the prospective tenants ultimately find alternative housing.

We look to *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1943), as an analogy. In *Prince*, the United States Supreme Court refused to grant an exemption to child labor laws for children distributing religious literature. As in this case, the state had a transactional interest: preventing exploitation of children in employment. Thus, the state objected to child labor, the particular activity at issue, per se, not to an effect of that activity. The state legislature had prohibited children from working under certain conditions. Therefore, permitting any child to work under such conditions resulted in harming the government's transactional interest. This transactional government interest does not involve a numerical cutoff below which the harm is insignificant unlike in *Frank*.

Similarly, in the instant case, the legislature and municipal assembly determined that housing discrimination based on irrelevant characteristics should be eliminated. *See Hotel, Motel, Restaurant, Etc. Union Local 879 v. Thomas*, 551 P.2d 942, 945 (Alaska 1976) ("[T]he statutory scheme constitutes a mandate to the agency to seek out and eradicate discrimination in ... the rental of real property."); *Loomis Electronic Protection, Inc. v. Schaefer*, 549 P.2d 1341, 1343 (Alaska 1976) (recognizing the Alaska Legislature's "strong statement of purpose in enacting AS 18.80, and its avowed determination to protect the civil rights of all Alaska citizens"); *see also* AS 18.80.200; AMC 5.10.010. The existence of this transactional interest distin-

guishes this case from *Frank* and most other free exercise cases where courts have granted exemptions. The government's transactional interest in preventing discrimination based on irrelevant characteristics directly conflicts with Swanner's refusal to rent to unmarried couples. The government views acts of discrimination as independent social evils even if the prospective tenants ultimately find housing. Allowing housing discrimination that degrades individuals, affronts human dignity, and limits one's opportunities results in harming the government's transactional interest in preventing such discrimination. Under *Frank*, this interest will clearly "suffer if an exemption is granted to accommodate the religious practice at issue."

The dissent attempts to prove that the state does not view marital status discrimination in housing as a pressing problem by pointing to other areas in which the state itself discriminates based on marital status. However, those areas are easily distinguished. The government's interest here is in specifically eliminating marital status discrimination in housing, rather than eliminating marital status discrimination in general. Therefore, the other policies which allow marital status discrimination are irrelevant in determining whether the government's interest in eliminating marital status discrimination in housing is compelling.

In the examples the dissent cites, treating married couples differently from unmarried couples is arguably necessary to avoid fraudulent availment of benefits available only to spouses. The difficulty of discerning whose bonds are genuine and whose are not may justify requiring official certification of the bonds via a marriage document. That problem is not present in housing cases: as this case demonstrates, if anything, an unmarried couple who wish to live together are at a disadvantage if they claim to be romantically involved.

It is important to note that any burden placed on Swanner's religion by the state and municipal interest in eliminating discrimination in housing falls on his conduct and not his beliefs. Here, the burden on his conduct affects his commercial activities. In *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), the United States Supreme Court stated the distinction between commercial activity and religious observance:

> When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith, are not to be superimposed on the statutory schemes which are binding on others in that activity.

*Id.* at 261, 102 S.Ct. at 1057.

Swanner complains that applying the anti-discrimination laws to his business activities presents him with a "Hobson's choice"—to give up his economic livelihood or act in contradiction to his religious beliefs. A similar argument was advanced in *Seward Chapel*, where Seward Chapel argued that applying the city zoning ordinances to prohibit construction of a parochial school impermissibly burdened the chapel's free exercise rights. 655 P.2d at 1299. We concluded that "there has been no showing of a religious belief which requires members of Seward Chapel to locate in [a specific place].... [T]he inconvenience and economic burden of which Seward Chapel now complains is caused largely by the choice to build in [a specific place] ..." *Id.* at 1302 (footnote omitted).

Swanner has made no showing of a religious belief which requires that he engage in the property-rental business. Additionally, the economic burden, or "Hobson's choice," of which he complains, is caused by his choice to enter into a commercial activity that is regulated by anti-discrimination laws. Swanner is voluntarily engaging in property management. The law and ordinance regulate unlawful practices in the rental of real property and provide that those who engage in those activities shall not discriminate on the basis of marital status. *See* AS 18.80.240; AMC 5.20.020. Voluntary commercial activity does not receive the same status accorded to directly religious activity. *Cf. Frank v. State*, 604 P.2d at 1075 (exempting an Athabascan Indian from state hunting regulations "to permit the observance of the ancient traditions of the Athabascans").

"As [James] Madison summarized the point, free exercise should prevail in every case where it does not trespass on private rights or the public peace." Michael W. McConnell, *Free Exercise Revisionism and the Smith Decision,* 57 Chi.L.Rev. 1109, 1145 (1990) (citation omitted). Because Swanner's religiously impelled actions trespass on the private right of unmarried couples to not be unfairly discriminated against in housing, he cannot be granted an exemption from the housing anti-discrimination laws. Therefore, we conclude that enforcement of AMC 5.20.-020 and AS 18.80.240 against Swanner does not violate his right to free exercise of religion under the Alaska Constitution.

### D. *The AERC Did Not Deprive Swanner of Due Process of Law*

#### 1. *AMCR 5.10.015(A) is Not an Unconstitutional Delegation by the AERC*

Anchorage Municipal Code 5.10.040 authorizes the AERC: (a) to hold public hearings; (b) to administer oaths and issue subpoenas; (h) to delegate to its executive director all powers and duties except the power to hold hearings and issue orders; and (i) to adopt procedural and evidentiary rules necessary to fulfill the intent of Title 5. AMC 5.10.040. The AERC's power to "adopt procedural and evidentiary rules" is effectuated by promulgating municipal regulations.

Anchorage Municipal Code of Regulations (AMCR) provides the scope of the hearing examiner's recommendation.

The hearing examiner ... shall rule on the admissibility of evidence and other procedural matters. On any ·question which would be determinative of the jurisdiction of the commission or of the culpability of any party, the hearing examiner ... may only make recommendations to the full commission.

12. On February 16, 1993, the AERC repealed AMCR 5.10.013 and 5.10.015. *See* AMCR 5.60.-003(F), 5.60.012(C), (D) for the new regulations replacing these sections.

We apply the regulations as they existed when Swanner's case began at the agency level.

AMCR 5.10.013(C)(2).[12] Additionally, "[a]ll recommendations of the hearing examiner ... shall be consistent with commission decisions and regulations." AMCR 5.10.-013(C)(4).

AMCR 5.10.015(A) states:

After a party ... receives the hearing examiner's ... proposed findings of fact, conclusions of law and proposed order, that person or his/her representative may, within 10 days or such other time fixed by the chair, present written objections to the commission. If no party files an objection within ten days, the proposal shall become final.

▮ Swanner claims that AMCR 5.10.-015(A) directly conflicts with AMCR 5.10.-013(C)(2) because "[Section] 5.10.015 appears to permit the commission to adopt the hearing examiner's recommendations without ever considering its content, rationale or rectitude." He interprets AMCR 5.10.013(C)(2) as authorizing only "the full commission" to determine a question which is determinative of jurisdiction or of the culpability of a party; Swanner asserts that his culpability in housing discrimination was at issue. He contends that the AERC abdicated its responsibility by adopting the hearing examiner's recommendation, and, therefore, the AERC violated AMCR 5.10.013.

▮ Swanner is correct that the hearing examiner did not have the authority to determine Swanner's culpability. Instead he had the authority to make a recommendation, which is exactly what he did. Hearing Examiner Landau made a recommendation to the AERC and the AERC decided to adopt it. Therefore, no conflict exists between AMCR 5.10.013(C)(2) and AMCR 5.10.015(A), and the AERC followed its own regulations in adopting the hearing examiner's recommendation.[13]

13. Where an agency interprets its own regulations, a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue. *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982) (citing Kenneth C. Davis, *Administrative Law Treatise* § 7.22, at 105–08 (2d ed. 1979)).

### 2. The Regulations Do Not Require an Independent Review by the AERC

■ Swanner finds fault with this process and complains that the AERC's regulations do not grant it authority to approve a hearing examiner's decision without conducting an independent review. No rule of procedure provides that the AERC must independently review the hearing examiner's recommendations. AMCR 15.10.015(B) expressly provides for the AERC's review of the hearing examiner's recommendations after a party timely files an objection. Swanner did not file an objection; therefore, the regulations required no independent review by the AERC.

### 3. Due Process Did Not Require That the AERC Personally Notify Swanner That It Would Adopt the Hearing Examiner's Recommendation Absent an Objection Within Ten Days

■ Swanner claims the AERC's adoption of the hearing examiner's recommendation violated his constitutional right to due process of law. Both the Alaska and United States Constitutions provide that a person shall not be deprived of "life, liberty, or property, without due process of law." Alaska Const., Art. 1, § 7; U.S. Const. amend. XIV, § 1. "Due process requires 'that deprivation of life, liberty or property by adjudication be proceeded by notice . . . appropriate to the nature of the case.'" *Wickersham v. State Com. Fisheries Entry Comm'n*, 680 P.2d 1135, 1144 (Alaska 1984) (quoting *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950)). This court held "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Aguchak v. Montgomery Ward Co., Inc.*, 520 P.2d 1352, 1356 (Alaska 1974) (adopting *Mullane* language for analysis under the Alaska Constitution).

Swanner states that he did not receive notice that his failure to object to the hearing examiner's recommended decision would result in the AERC making the decision final. He claims that he became aware of the AERC's intent to approve the hearing examiner's recommended decision the day after objections to the proposed order were due, when the AERC issued a memorandum stating the proposed order became final. Therefore, he claims he was not given "notice reasonably calculated, under all the circumstances, to apprise [him] of the pendency of the action, as required by Alaska law."

Swanner cannot claim that he was unaware of the pendency of this action. The actual hearing in this matter occurred on October 9 and 11, 1990, and Swanner participated in seven months of formal pre-hearing procedures and discovery. Swanner was clearly aware of the "pendency of this action." Moreover, AMCR 5.10.015 was readily available to Swanner and the public from both the AERC and the State Law Library. Accordingly, the AERC did not deny Swanner due process.

## III. CONCLUSION

We hold that Swanner impermissibly discriminated against Bowles, Harper, and Moose because he would not rent to them based on their marital status. The Free Exercise Clause of the United States and Alaska Constitutions do not permit Swanner to disobey the state and municipal anti-discrimination laws by entitling him to an exemption. The AERC did not deny Swanner his right to due process by following its procedural regulations.

The AERC's final order and the superior court's opinion are AFFIRMED.

MOORE, C.J., dissents.

MOORE, Chief Justice, dissenting.

Article I, section 4 of the Alaska Constitution declares that "[n]o law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof." As the majority correctly recognizes, this provision may provide greater protection of free exercise rights than is now provided under the United States Constitution. Opinion at 280–281. Accordingly, while the United States Supreme Court has adopted a new test to analyze free exercise claims such as

the one at issue here,[1] the majority agrees that we will continue to apply the compelling interest test in interpreting the free exercise clause of the Alaska Constitution. Opinion at 281.

Our decision in *Frank v. State*, 604 P.2d 1068 (Alaska 1979), sets forth the framework from which we must determine whether AMC 5.20.020 and AS 18.80.240 violate Swanner's right to the free exercise of his religion. As we stated in *Frank*, "[n]o value has a higher place in our constitutional system of government than that of religious freedom." 604 P.2d at 1070. For this reason, a facially neutral statute or ordinance which interferes with religious-based conduct must be justified by a compelling state interest. *Id.* Absent such an interest, our constitution requires an exemption from the laws at issue to accommodate religious practices. *Id.* at 1070–71.

The majority acknowledges that Swanner's actions fall within the ambit of the free exercise clause. Swanner has shown that his refusal to rent apartments to unmarried individuals who plan to live with a member of the opposite sex is based on his Christian faith, which strictly proscribes such cohabitation. No one questions the sincerity of his religious belief that he facilitates a sin by renting to unmarried individuals such as the complainants in this case. *See* Opinion at 281–282. For this reason, Swanner's religiously impelled conduct must be protected under Alaska law unless the AERC can show that the conduct poses "some substantial threat to public safety, peace or order," or that there exist competing governmental interests "of the highest order" which are not otherwise served without limiting Swanner's conduct. *Frank*, 604 P.2d at 1070 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) and *Sherbert v. Verner*, 374 U.S. 398, 403, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963)); *Seward Chapel, Inc. v. City of Seward*, 655 P.2d 1293, 1301 n. 33 (Alaska 1982). I do not believe the AERC has met its burden in this case. I would

therefore grant Swanner an exemption to accommodate his religious beliefs.

First, I note that in determining that the governmental interest in this case is "of the highest order," the majority announces an entirely new and unnecessary test examining the state's "transactional" and "derivative" interests. Opinion at 282. Under this analysis, the majority concludes that the state has a transactional, or *per se*, interest in preventing "individual acts of discrimination based on irrelevant characteristics" which overrides Swanner's free exercise rights in this case. Because the interest is "transactional," the majority concludes that no evidentiary basis is required to show that rental housing for unmarried couples has become scarce. However, before the court would enforce the state's "derivative" interest in "ensuring access to housing for everyone," the AERC apparently would have to make an evidentiary showing that cohabiting couples have experienced hardship in finding available housing, *i.e.*, that Swanner's conduct poses a "substantial threat to public safety, peace or order." *Frank*, 604 P.2d at 1070.

In my opinion, this amorphous analysis of the state's interests ultimately will prove to be useless in resolving future free exercise cases. Even in this case, I do not believe it provides a useful distinction of the interests at issue. For example, the majority determines that the state has a *per se* objection to marital status discrimination in housing which overcomes Swanner's free exercise rights. The majority defines this interest as that in "preventing acts of discrimination based on irrelevant characteristics." Opinion at 282. Such an articulation of the state's interest poses myriad questions. Who is to determine what is an "irrelevant" characteristic? Obviously, marital status is not "irrelevant" to Swanner. It is central to the question whether he will be committing a sin under the dictates of his religion. Is the legislative branch the final arbiter of relevancy or irrelevancy? Further, the discrimination at issue here is not based on innate

---

**1.** *See Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 884–90, 110 S.Ct. 1595, 1603–06, 108 L.Ed.2d 876 (1990).

"characteristics" but rather on the *conduct* of potential tenants. While this conduct is worthy of some protection, it does not warrant the same constitutional protection given to religiously compelled conduct. I am not willing to place the right to cohabitate on the same constitutional level as the right to freedom from discrimination based on either innate characteristics—such as race or gender—or constitutionally protected belief, such as freedom of religion.

In addition, it remains unclear to me how the state's "derivative" interests are to be identified. Here, that interest is defined with little explanation as being the state's interest in "providing access to housing for all." Opinion at 282. Does this mean the state has no *per se* objection to the fact that some individuals may have limited access to housing? In *Frank*, could it not be said that the state had a *per se* interest in enforcing its hunting regulations?

In *Frank*, this court set forth a workable and sufficient guide to determine whether a governmental interest is sufficiently compelling to overcome an individual's free exercise rights. 604 P.2d at 1070. It seems to me that the majority's effort to expand this analysis adds little to the actual analysis of interests at stake. To the contrary, I see the majority's expansion of *Frank* as little more than a strained effort to distinguish *Frank* from the present situation when such a distinction is not logically justified. In this effort, the majority totally ignores the record in this case, and it engages in a game where the "transactional" or "derivative" label attached to any given state interest predetermines the outcome of the case.

*There is no governmental interest "of the highest order" to justify the burden on Swanner's fundamental rights.*

Even applying the framework announced by the court in analyzing whether the state's

interest is "of the highest order," I cannot agree with the court's reasoning and resulting decision. In essence, the majority's conclusion is that marital status discrimination constitutes such an affront to human dignity that the state has a *per se* obligation "of the highest order" to prevent it. Based on my analysis of free exercise jurisprudence and the issues surrounding marital status discrimination, I cannot conclude that eradication of marital status discrimination in the rental housing industry constitutes a governmental interest of such high order as to justify burdening Swanner's fundamental constitutional rights.[2]

There can be no question that the state has a compelling interest in eradicating discrimination against certain historically disadvantaged groups. *See, e.g., Bob Jones University v. United States*, 461 U.S. 574, 593–95, 103 S.Ct. 2017, 2029–30, 76 L.Ed.2d 157 (1983) (racial discrimination); *Roberts v. United States Jaycees*, 468 U.S. 609, 625, 104 S.Ct. 3244, 3253–54, 82 L.Ed.2d 462 (1984) (gender discrimination). This compelling interest has been found to exist based on a determination that the discrimination at issue is so invidious to personal dignity and to our concept of fair treatment as to warrant strict protection. There is no question that Swanner's right to freely exercise his religion could and should be burdened if he engaged in such discrimination as a result of his religious beliefs.

This fact does not mean, however, that *every* form of discrimination is equally invidious or that the state's interest in preventing it necessarily outweighs fundamental constitutional rights. Rather, the cases which have upheld an imposition on free exercise have articulated certain specific reasons that some forms of discrimination are of particu-

2. Significantly, the majority cites no cases to support the proposition that the state has a compelling interest in eradicating marital status discrimination, particularly when the discrimination at issue must be balanced against interests of constitutional magnitude. Both *Loomis Elec. Protection, Inc. v. Schaefer*, 549 P.2d 1341 (Alaska 1976), and *Hotel, Motel, Restaurant, Constr. Camp Employees and Bartenders Union Local 879 v. Thomas*, 551 P.2d 942 (Alaska 1976), cite the general purpose statement of AS 18.80.200; however, neither case does so to establish the existence of a compelling state interest. Both cases involved gender discrimination, the eradication of which has been held to be a compelling interest, as I discuss *infra*. Neither case is applicable to the instant case, where marital status discrimination is involved and where the discriminating party is asserting a core constitutional freedom.

lar governmental interest and deserving of heightened judicial scrutiny. In *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), for example, the Supreme Court refused to grant tax-exempt status to schools that maintained racially discriminatory policies under their interpretation of the Bible. In doing so, the Court discussed this nation's long history of officially sanctioned racial segregation and discrimination in education. It further noted that, since the late 1950s, every pronouncement of the Supreme Court and myriad Acts of Congress and Executive Orders attested to a national policy prohibiting such discrimination. *Id.* at 594–95, 604, 103 S.Ct. at 2029–30, 2035. It therefore concluded that "[t]here can no longer be any doubt that racial discrimination in education violates deeply and widely accepted views of elementary justice." *Id.* at 592, 103 S.Ct. at 2029. Accordingly, the government's interest in eradicating racial discrimination in education was found to be compelling.

Similarly, in *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court declared that the state's compelling interest in eradicating discrimination against its female citizens justified any minimal interference with an all-male organization's freedom of expressional association. In analyzing the weight of the state's interest, the Court discussed the invidious nature of gender bias, stating:

> [D]iscrimination based on archaic and overbroad assumptions about the relative needs and capacities of the sexes forces individuals to labor under stereotypical notions that often bear no relationship to their actual abilities. It thereby both deprives persons of their individual dignity and denies society the benefits of wide participation in political, economic, and cultural life.

*Id.* at 625, 104 S.Ct. at 3253. (citations omitted). The Court also observed that society generally had recognized the importance of removing "the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups, including women." *Id.* at 626, 104 S.Ct. at 3254. Based on these conclusions, it was no stretch to find that the state possessed a compelling interest in eradicating gender discrimination, and that this interest was sufficient to overcome the Jaycees' First Amendment claim. *Id.* at 626–29, 104 S.Ct. at 3254–56.

The majority today avoids engaging in any similar analysis of marital status discrimination to explain why or how it is so damaging to human dignity to become of such governmental import as to overcome a fundamental constitutional right.[3] This analysis is critical. The majority cites no evidence that marital status classifications have been associated with a history of unfair treatment that would warrant heightened governmental protection.[4] To the contrary, I believe the law is clear that marital status classifications have been accorded relatively low import on the scale of interests deserving governmental protection. For instance, the government

---

**3.** While the majority contends that its decision today affects only Swanner's conduct, not his religious beliefs, Opinion at 283, I do not believe that the Alaska Constitution distinguishes so clearly between religious belief and religious conduct. *See Frank*, 604 P.2d at 1070 (because of the close relationship between conduct and belief, and because of the high value we assign to religious beliefs, religiously impelled actions can be forbidden only where they are outweighed by a compelling governmental interest). *See also Wisconsin v. Yoder*, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535–36, 32 L.Ed.2d 15 (1972) ("[B]elief and action cannot be neatly confined in logic-tight compartments."); *Smith*, 494 U.S. at 893, 110 S.Ct. at 1608 (O'Connor, J., concurring) ("Because the First Amendment does not distinguish between religious belief and religious conduct, conduct motivated by sincere religious belief, like the belief itself, must therefore be at least presumptively protected by the Free Exercise Clause."). I would hold that conduct that is motivated by sincere religious belief is presumptively protected by Article I, section 4.

**4.** The majority pronounces that "the government views acts of discrimination as independent social evils...." Opinion at 283. This analysis ignores the specific issue here: discrimination in housing based on *marital status*. Had Swanner's religious beliefs compelled him to discriminate based on characteristics such as race or gender, I clearly would vote to deny an exemption. However, I am not convinced that marital status discrimination is or should be treated as comparable in any way to race or gender discrimination.

itself discriminates based on marital status in numerous regards, and there is no suggestion that this practice should be reexamined. Alaska law explicitly sanctions such discrimination. *See, e.g.,* AS 13.11.015 (intestate succession does not benefit unmarried partner of decedent); AS 23.30.215(a) (workers' compensation death benefits only for surviving spouse, child, parent, grandchild, or sibling); Alaska R.Evid. 505 (no marital communication privilege between unmarried couples); *Serradell v. Hartford Accident & Indemn. Co.,* 843 P.2d 639, 641 (Alaska 1992) (no insurance coverage for unmarried partner under family accident insurance policy).

In addition, marital status classifications have never been accorded any heightened scrutiny under the Equal Protection Clause of either the federal or the Alaska Constitutions. Disparate treatment of individuals based on classifications such as race, on the other hand, are reviewed under the highest scrutiny. *See, e.g., Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (restrictions curtailing the civil rights of a single racial group are immediately suspect and deserve strict scrutiny analysis). Gender-based classifications are similarly analyzed under a heightened level of scrutiny at the federal level. *See, e.g., Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980) (gender-based discrimination must serve important governmental objectives and the discriminatory means employed must be substantially related to the achievement of those objectives). The sliding scale approach to equal protection analysis under the Alaska Constitution similarly applies a heightened level of scrutiny to laws burdening racial minorities or other suspect classifications. *See State v. Ostrosky,* 667 P.2d 1184, 1193 (Alaska 1983) ("[L]aws which embody classification schemes that are more constitutionally suspect, such as laws discriminating against racial or ethnic minorities, are more strictly scrutinized."); *State v. Erickson,* 574 P.2d 1, 11–12 (Alaska 1978) (where funda-

mental rights or suspect categories are involved, equal protection analysis under the Alaska Constitution requires a compelling state interest).

At the federal level, the eradication of marital status discrimination in the housing context clearly has not been treated as a compelling interest.[5] Neither the Federal Fair Housing Act, 42 U.S.C. § 3604 (1988), nor the Federal Civil Rights Act, 42 U.S.C. §§ 1981 and 1982 (1988), would prohibit the precise form of marital status discrimination at issue here, unless it was being used as a pretext for a more egregious form of discrimination, such as that based on race. *See Marable v. H. Walker & Assocs.,* 644 F.2d 390, 397 (5th Cir.1981) (finding a violation of the fair housing and civil rights statutes only after concluding that, although the landlord asserted that he refused to rent housing based on the applicant's marital status, this excuse was a mere pretext for racial discrimination); *see also* James A. Kushner, *The Fair Housing Amendments Act of 1988: The Second Generation of Fair Housing,* 42 Vand.L.Rev. 1049, 1106 (1989) (the Fair Housing Act does not protect unmarried couples from a landlord's refusal to rent unless a case can be made that the marital status discrimination is merely a pretext for racial, ethnic, religious or gender-based discrimination).

My research has not revealed a single instance in which the government's interest in eliminating marital status discrimination has been accorded substantial weight when balanced against other state interests, let alone fundamental constitutional rights. I find nothing to suggest that marital status discrimination is so invidious as to outweigh the fundamental right to free exercise of religion.

The majority comments that its result today is justified because Swanner's right to the free exercise of his religious beliefs must be accorded less weight since he has entered the commercial arena. Opinion at 283–284.

---

5. While I recognize that Alaska's antidiscrimination legislation is not substantially similar to comparable federal laws—*see, e.g., Hotel, Motel, Restaurant, Constr. Camp Employees and Bartenders Union Local 879 v. Thomas,* 551 P.2d

942, 945 (Alaska 1976)—the majority's failure to cite any authority for a compelling interest at the state level in this case leads me to make this comparison for further guidance.

As discussed above, it is well-accepted that an individual's right to religious freedom will not and cannot always override other interests. *See, e.g., United States v. Lee,* 455 U.S. 252, 261, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127 (1982) (rejecting Amish employer's claim that imposition of social security taxes violated his free exercise rights). However, neither *Lee* nor any other case of which I am aware stands for the proposition that individuals like Swanner altogether waive their constitutional right to the free exercise of religion simply because a conflict between their religious faith and some legislation occurs in a commercial context. To the contrary, the *Lee* Court recognized that, even in a commercial setting, the state must justify its limitation on religious liberty by showing the limitation is "essential to accomplish an overriding governmental interest." *Id.* at 257–58, 102 S.Ct. at 1055. The AERC has simply failed to meet that burden here.

The majority suggests that Swanner's constitutional rights must be accorded lesser weight because he *voluntarily* engages in the property management industry, and his right to engage in that business is not entitled to judicial protection. Opinion at 283–284. However, this court has stated that "the right to engage in an economic endeavor within a particular industry is an 'important' right for state equal protection purposes." *State v. Enserch Alaska Constr., Inc.,* 787 P.2d 624, 632 (Alaska 1989) (citing *Commercial Fisheries Entry Comm'n v. Apokedak,* 606 P.2d 1255, 1266 (Alaska 1980)). The ability to participate in a particular industry, such as rental property management, is therefore entitled to more protection under our state constitution than the majority acknowledges.

The majority incorrectly relies on *Seward Chapel* to arrive at its contrary conclusion. Unlike the present case, *Seward Chapel* did not involve a forced decision between giving up one's livelihood or violating one's religious beliefs. In *Seward Chapel,* we merely found that no religious belief required an exception to city zoning laws prohibiting the location of a parochial school on a specific site. 655

P.2d at 1302. No activity was totally prohibited; only the place in which it could be conducted was being regulated. I believe that there is a significant difference between the inconvenience placed upon Seward Chapel and the total abrogation of Mr. Swanner's right to earn a living in his chosen profession while abiding by his sincerely held religious beliefs.

*There is no basis in the record to conclude that an exemption in this case would create a substantial threat of harm.*

In *Frank,* this court required that the state establish precisely how its interest would suffer if an exemption was granted to accommodate the religious conduct at issue. 604 P.2d at 1073. Thus, even accepting that the government has a strong interest in assuring available housing, the AERC must show how this interest will suffer in real terms if an exemption is granted to Swanner.

I see no evidence whatsoever in the record to suggest that Swanner's conduct poses a substantial threat to public safety, peace or order such that the burden on Swanner's rights is justified. For this reason, I fail to see why an exemption to accommodate Swanner's religious beliefs is not warranted. Mere speculation that housing for unmarried couples may become scarce if an exemption is granted is insufficient to establish a compelling governmental interest. In *Frank,* we specifically criticized the state for speculating, without any supporting data, that an exemption to moose hunting regulations for an Athabascan funeral potlatch would open the flood gates to widespread poaching. *Id.* at 1074. We stated: " 'Justifications founded only on fear and apprehension are insufficient to overcome rights asserted under the First Amendment.' " *Id.* (quoting *Teterud v. Burns,* 522 F.2d 357, 361–62 (8th Cir.1975)). We further found that, since the state had not presented any evidence that so many moose would be taken for funeral potlatch ceremonies as to jeopardize appropriate population levels, it had not met its burden to justify curtailing the religious practice at issue. *Id.*[6]

6. Our requirement of evidentiary support for the state's refusal to grant an exemption is well-supported by United States Supreme Court precedent. *See Thomas v. Review Bd. of Indiana*

As in *Frank*, the record here is completely devoid of any evidence to suggest that there are so many landlords or property managers in Anchorage whose religious beliefs are identical to Swanner's as to constitute a substantial threat to available housing. In a city the size of Anchorage, it is difficult to conclude based on intuition alone that housing availability for unmarried couples will become so scarce as to constitute a substantial threat to community welfare. If there were some persuasive evidence to support such a conclusion, I may well have arrived at a different conclusion today.

*Conclusion*

I believe Swanner has been presented with a Hobson's choice of either complying with the law or abandoning the precepts of his religion. Since the government's interest in this particular law does not outweigh Swanner's fundamental religious rights, Swanner should be granted an exemption to accommodate his beliefs. The AERC relies on nothing more than a pure conclusion that the state has a compelling interest in preventing marital status discrimination in housing. It has not presented any evidence that an exemption in this case would result in a substantial threat to housing availability. Nor does it explain exactly what is so invidious about marital status discrimination as to make its proscription a governmental interest of the highest order, comparable with the state's interest in eradicating racial or gender discrimination. For these reasons, I fail to see how a limited exemption for Swanner and others similarly situated is not justified. In my opinion, the analysis and result set forth in this case will return to haunt this court in future decisions.

*Employment Sec. Div.*, 450 U.S. 707, 719, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981) (rejecting state's asserted reasons for refusing a religious exemption due to lack of evidence in the record); *Wisconsin v. Yoder*, 406 U.S. 205, 224–29, 92 S.Ct. 1526, 1537–40, 32 L.Ed.2d 15 (1972) (rejecting state's argument concerning the dangers of a religious exemption as speculative and unsupported by the record); *Sherbert v. Verner*, 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963) ("[T]here is no proof whatever to warrant such fears ... as those which the [state] now advance[s]."); *see also Smith*, 494 U.S. at 911, 110 S.Ct. at 1618 (Blackmun, J., dissenting) (state's assertion that religious exemption for peyote use would harm health and safety of state citizens is unsupported and speculative).