# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

January 30, 2013[*]

**Before**

JOEL M. FLAUM, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 13-1077

| | |
|---|---|
| WILLIAM D. GROTE, III, et al., | Appeal from the |
| *Plaintiffs-Appellants,* | United States District Court for the |
| | Southern District of Indiana. |
| v. | |
| | No. 4:12-cv-00134-SEB-DML |
| KATHLEEN SEBELIUS, in her official | |
| capacity as the Secretary of the United | Sarah Evans Barker, |
| States Department of Health and Human | *Judge*. |
| Services, et al., | |
| *Defendants-Appellees.* | |

**O R D E R**

The following are before the court:

1.   PLAINTIFFS-APPELLANTS' MOTION FOR AN INJUNCTION PENDING
     APPEAL, filed on January 11, 2013, by counsel for the appellants.

2.   OPPOSITION TO PLAINTIFFS' MOTION FOR AN INJUNCTION PENDING
     APPEAL, filed on January 17, 2013, by counsel for the appellees.

---

[*] This order is being released in typescript.  It will be published; a printed version will
follow.

3.      PLAINTIFFS-APPELLANTS' REPLY IN SUPPORT OF THEIR MOTION FOR AN INJUNCTION PENDING APPEAL, filed January 24, 2013, by counsel for the appellants.

Members of the Grote Family and their company, Grote Industries, appeal the district court's order denying their motion for a preliminary injunction against the enforcement of provisions of the Patient Protection and Affordable Care Act ("ACA") and related regulations that require Grote Industries to provide coverage for contraception and sterilization procedures in its group health-insurance plan.[1] They have moved for an injunction pending appeal. *See* FED. R. APP. P. 8. We recently granted such an injunction in a similar case. *See Korte v. Sebelius*, No. 12-3841, 2012 WL 6757353 (7th Cir. Dec. 28, 2012). As explained below, this case is materially indistinguishable. Accordingly, we consolidate this case with *Korte* and likewise grant the motion here.

The Grote Family owns Grote Industries, a privately held, family-run business headquartered in Madison, Indiana. Grote Industries manufactures vehicle safety systems. The company has 1,148 full-time employees working at various locations and provides a group health-insurance plan for the benefit of its employees. The plan is self-insured and renews every year on January 1.

The members of the Grote Family are Catholic and operate their business in accordance with the precepts of their faith, including the Catholic Church's teachings regarding the moral wrongfulness of abortifacient drugs, contraception, and sterilization. Consistent with the Grote Family's religious commitments, before January 1, 2013, the Grote Industries health-insurance plan did not cover abortifacient drugs, contraception, or sterilization.

The ACA and accompanying regulations mandate that the Grote Industries health-insurance plan provide no-cost coverage for all FDA-approved contraceptives, sterilization procedures, and related services. In brief, the regulatory framework imposing this mandate is as follows: The ACA requires nongrandfathered and nonexempt group health-insurance plans to cover certain preventive health services without cost-sharing, *see* 42 U.S.C. § 300gg-13(a)(4), and regulations promulgated by the United States Department of Health

---

[1] The individual plaintiffs are William D. Grote, III; William Dominic Grote, IV; Walter F. Grote, Jr.; Michael R. Grote; W. Frederick Grote, III; and John R. Grote. For ease of reference, we refer to them collectively as the Grote Family. Grote Industries consists of two companies formed under the laws of Indiana: Grote Industries, LLC, and Grote Industries, Inc. The Grote Family, including members not listed as plaintiffs, fully own Grote Industries, Inc. This entity, in turn, serves as the managing member of Grote Industries, LLC.

and Human Services ("HHS") specify that the required coverage must include all FDA-approved contraceptive methods and sterilization procedures, *see* 77 Fed. Reg. 8725 (Feb. 15, 2012) ("the contraception mandate" or "the mandate"). This includes oral contraceptives with possible abortifacient effect (including emergency contraception such as the "morning-after pill") and intrauterine devices. *See id.*; OFFICE OF WOMEN'S HEALTH, FOOD & DRUG ADMIN., BIRTH CONTROL GUIDE 10-12, 16-20 (2012), http://www.fda.gov/downloads/ForConsumers/ByAudience/ForWomen/FreePublications/UCM282014.pdf.

The contraception mandate takes effect starting in the first plan year after August 1, 2012. *See* 77 Fed. Reg. at 8725-26. Because the Grote Industries health-insurance plan renews on January 1 of each year, the mandate required the company to begin covering oral contraception, sterilization procedures, intrauterine devices, and emergency contraception when the plan renewed on January 1, 2013. The mandate is backed by heavy financial penalties; employers who do not comply face enforcement actions, *see* 29 U.S.C. § 1132(a); a penalty of $100 per day per employee, *see* 26 U.S.C. § 4980D(a)-(b); and an annual tax surcharge of $2,000 per employee, *see id.* § 4980H.

The Grote Family and Grote Industries filed suit on October 29, 2012, seeking declaratory and injunctive relief blocking the enforcement of the contraception mandate against them. They assert constitutional claims under the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment, and the Due Process Clause of the Fifth Amendment, as well as claims alleging violations of the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4, and the Administrative Procedure Act, 5 U.S.C. § 706. They moved for a preliminary injunction; the district court denied the motion on December 27, 2012.

The following day we issued our order in *Korte* granting the motion for an injunction pending appeal, 2012 WL 6757353, at *1, prompting the Grote Family and Grote Industries to request reconsideration in the district court. On January 3, 2013, the district court, aware of our decision in *Korte*, denied the motion for reconsideration. The court acknowledged the similarities between *Korte* and this case but declined to follow our order in *Korte*, emphasizing that it was not a precedential ruling on the merits. This appeal followed. *See* 28 U.S.C. § 1292(a)(1). As in *Korte*, the Grote Family and Grote Industries moved for an injunction pending appeal,[2] relying for present purposes solely on their RFRA claim.[3]

---

[2] We evaluate a motion for an injunction pending appeal using the same factors and "sliding scale" approach that govern an application for a preliminary injunction. *See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547-48 (7th Cir. 2007). The moving party must establish that it has "(1) no

(continued...)

There is no material distinction between the motion in this case and the one we addressed and granted in *Korte.* There, we considered the likelihood of success of a claim brought by a secular, for-profit corporation owned and operated by a Catholic family in accordance with the teachings of the Catholic faith. *Korte*, 2012 WL 6757353, at *1. The Kortes, like the Grote Family here, sued for declaratory and injunctive relief in the form of an exemption from the requirements of the contraception mandate. The Kortes' company, K & L Contractors, provided a group health-insurance plan for its nonunion employees. In August 2012 the Kortes discovered that the plan included coverage for contraception and wanted to replace it with a plan that conforms to the requirements of their faith, but the contraception mandate prevented them from doing so. *Id.* They sued the HHS Secretary asserting (among other claims for relief) that the mandate violated their rights under RFRA. They moved for a preliminary injunction, but the district court denied the motion. The Kortes and their company (collectively, "the Kortes") appealed. They asked us for an injunction pending appeal, and we granted the motion. Reserving plenary review for later in the appeal, we held that the Kortes had established a reasonable likelihood of success on their RFRA claim. *Id.* at *3-4. We also held that the equitable balance tipped in favor of granting the injunction; the harm to the Kortes' religious-liberty rights outweighed the temporary harm to the government's interest in providing greater access to cost-free contraception and related services. *Id.* at *4-5.

In all important respects, this case is identical to *Korte*; our analysis there applies with equal force here. If anything, the Grote Family and Grote Industries have a more compelling case for an injunction pending appeal. Unlike the health-insurance plan at issue in *Korte*, the Grote Industries health plan is self-insured and has never provided contraception coverage.

---

[2](...continued)

adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago,* 651 F.3d 684, 694 (7th Cir. 2011). Once the threshold requirements are met, the court weighs the equities, balancing each party's likelihood of success against the potential harms. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc.*, 549 F.3d 1079, 1100 (7th Cir. 2008). The more the balance of harms tips in favor of an injunction, the lighter the burden on the party seeking the injunction to demonstrate that it will ultimately prevail. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

[3] RFRA prohibits the federal government from imposing a "substantial[] burden [on] a person's exercise of religion even if the burden results from a rule of general applicability" unless the government demonstrates that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b).

Absent an injunction, the Grote Family and Grote Industries must now cover abortifacient drugs, contraception, and sterilization through the company's self-insured health plan. Thus, the only factual distinctions between the two cases actually strengthen the equities in favor of granting an injunction pending appeal.

And the legal analysis has not changed. The Grote Family and Grote Industries make essentially the same arguments as did the Kortes. They maintain that the legal duties imposed on them by the contraception mandate conflict with the religious duties required by their faith, and they cannot comply with both. The mandate, they contend, compels them to materially cooperate in a grave moral wrong contrary to the teachings of their church and levies severe financial penalties if they do not comply. In this way, they argue, the mandate substantially burdens their free-exercise rights, triggering the strict-scrutiny test codified in RFRA. As we noted in *Korte*, this "is an exacting standard, and the government bears the burden of satisfying it." *Id.* at *2.

In response the government advances the same arguments as it did in *Korte*. To abbreviate, the government maintains that (1) a secular, for-profit corporation cannot assert a claim under RFRA; (2) relatedly, the free-exercise rights of the individual plaintiffs are not affected because their corporation is a separate legal entity; and (3) the mandate's burden on their free-exercise rights is too remote and attenuated to qualify as "substantial" under RFRA because the decision to use contraception benefits is made by third parties— individual employees, in consultation with their medical providers. We addressed these arguments in our order in *Korte*, and nothing presented here requires us to reconsider that prior ruling. Here, as in *Korte*, the Grote Family's use of the corporate form is not dispositive of the claim. *See Korte*, 2012 WL 6757353, at *3 (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)). And the government's minimalist characterization of the burden continues to obscure the substance of the religious-liberty violation asserted here. *Id.* The members of the Grote Family contend that their faith forbids them to facilitate access to contraception by paying for it, as the mandate requires them to do.

And as in *Korte*, the government has not, at this juncture, made an effort to satisfy strict scrutiny. In particular, it has not demonstrated that requiring religious objectors to provide cost-free contraception coverage is the least restrictive means of increasing access to contraception. Although we again reserve plenary review of the merits for later in this appeal, for the reasons explained more thoroughly in our order in *Korte*, we conclude that the Grote Family and Grote Industries have established a reasonable likelihood of success on the merits of their RFRA claim. We also conclude that they will suffer irreparable harm absent an injunction pending appeal, and the balance of harms tips in their favor.

**IT IS ORDERED** that the motion for an injunction pending appeal is **GRANTED**. The defendants are enjoined pending resolution of this appeal from enforcing the contraception mandate against the Grote Family and Grote Industries.

**IT IS FURTHER ORDERED** that this case is consolidated with *Korte.* Oral argument will be scheduled by separate order when briefing has been completed.

ROVNER, *Circuit Judge*, dissenting. As a result of the court's decision to consolidate this appeal with *Korte v. Sebelius*, No. 12-3841, the *Grote* appellants' request for an injunction pending appeal comes before the same panel that ordered preliminary relief in *Korte. See Korte v. Sebelius*, 2012 WL 6757353 (7th Cir. Dec. 28, 2012) (unpublished order). I recognize that the arguments in favor of preliminary relief in *Grote* are in some ways stronger than those in *Korte* (for example, the Grotes' company was not already covering contraceptive care when the new federal mandate took effect, whereas the Kortes' company was). Despite the differences between the two appeals, I am no more persuaded that preliminary injunctive relief is warranted in *Grote* than I was in *Korte*. Specifically, the appellants have not, in my view, shown that they are reasonably likely to prevail on the merits of their claims. *See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547-48 (7th Cir. 2007). With the benefit of the memoranda submitted by the parties in *Grote* and additional time to contemplate some of the issues presented by these appeals, I write separately here to expand on the doubts I expressed in *Korte*.

Of the multiple theories of relief that the *Grote* plaintiffs have so far articulated in this litigation (and which were given thorough treatment in the district court's orders below), the only one invoked in this court as a basis for preliminary relief pending appeal is their claim under the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb *et seq.* ("RFRA"). Among other elements, that claim requires a showing that the regulatory mandate to provide contraceptive coverage, issued pursuant to the Patient Protection and Affordable Care Act, *see* 42 U.S.C. § 300gg–13(a)(4) ("Affordable Care Act"); 77 Fed. Reg. 8725 (Feb. 15, 2012), substantially burdens the plaintiffs' exercise of religion. § 2000bb-1(a), (b). A substantial burden is "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) (construing Religious Land Use and Institutionalized Persons Act , 42 U.S.C. §§ 2000cc *et seq.* ("RLUIPA")); *see Vision Church v. Village of Long Grove*, 468 F.3d 975, 997 (7th Cir. 2006) (RLUIPA) ("Similarly, interpreting the First Amendment, the Supreme Court has found a 'substantial burden' to exist when the

government puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'") (quoting *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 141, 107 S. Ct. 1046, 1049 (1987)); *see also Nelson v. Miller*, 570 F.3d 868, 878 (7th Cir. 2009) (RLUIPA and First Amendment); *Koger v. Bryan*, 523 F.3d 789, 799 (7th Cir. 2008) (RLUIPA). Like Judge Barker, I am not persuaded that the plaintiffs have made that showing.

I begin my analysis with a threshold point: on the record before us, it is only the Grotes, and not the corporate entities, which can claim to have a right to exercise religious freedoms. Grote Industries (by which I mean to include both Grote Industries, LLC and Grote Industries, Inc.) is a secular, for-profit business engaged in the manufacture of vehicle safety systems. So far as the limited record before us reveals, it has stated no religious goals as part of its mission, it does not select its employees, vendors, or customers on the basis of their religious beliefs, and it does not require its employees to conform their behavior to any particular religious precepts. As such, I cannot imagine that the company, as distinct from the Grotes, has any religious interests or rights to assert here. To be sure, a secular corporation does have some types of First Amendment rights: it has the right to engage in commercial speech in the promotion of its products, for example, *see generally Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S. Ct. 2343 (1980), and in pursuit of its interests as a corporate citizen, it has the right to articulate what government policies it supports or opposes and to contribute money to political campaigns in pursuit of its commercial agenda, *see Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876 (2010). Moreover, there do exist some corporate entities which are organized expressly to pursue religious ends, and I think it fair to assume that such entities may have cognizable religious liberties independent of the people who animate them, even if they are profit-seeking. *See, e.g., Tyndale House Publishers, Inc. v. Sebelius*, 2012 WL 5817323, at *6-*7 (D.D.C. Nov. 16, 2012) (for-profit publisher of Christian texts, owned by not-for-profit religious foundation and related trusts which directed publisher's profits to religious charity and educational work); *see also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 345 n.6, 107 S. Ct. 2862, 2873 (1987) (Brennan, J., concurring in the judgment) ("it is . . . conceivable that some for-profit activities could have a religious character").[1] Indeed, there is a regulatory exemption from the contraception mandate for

---

[1] *Compare E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 619 (9th Cir. 1988) (finding manufacturer of mining equipment to be a primarily secular company and therefore not a religious organization exempt from Title VII, despite, *inter alia*, religious beliefs of owners, company's financial support for religious missions, company's inclusion of religious tracts in company's outgoing mail and printing of Bible verses on its commercial documents, and weekly devotional services at workplace, where company was organized for profit, produced a secular product, was not affiliated with or supported by a church, and did not mention religious purpose in articles of

(continued...)

religious employers.  45 C.F.R. § 147.130(a)(1)(iv)(B).  But it appears to be common ground among the parties that Grote Industries does not meet the criteria for such an employer.  So far as it appears, the mission of Grote Industries, like that of any other for-profit, secular business, is to make money in the commercial sphere.  In short, the only religious freedoms at issue in this appeal are those of the Grotes, not the companies they own.  *See Hobby Lobby Stores, Inc. v. Sebelius*, 870 F. Supp. 2d 1278, 1291 (W.D. Okla. 2012) ("General business corporations do not, separate and apart from the actions or belief systems of their individual owners or employees, exercise religion. They do not pray, worship, observe sacraments or take other religiously-motivated actions separate and apart from the intention and direction of their individual actors.  Religious exercise is, by its nature, one of those "purely personal" matters referenced in [*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n. 14, 98 S. Ct. 1407, 1416 n.14 (1978)] which is not the province of a general business corporation.").

This brings me back to a point that I made in *Korte*, namely that it is the corporation, rather than its owners, which is obligated to provide the contraceptive coverage to which the owners are objecting.  *Korte v. Sebelius*, 2012 WL 6757353, at *5 (Rovner, J., dissenting).  Grote Industries is a closely-held, family-owned firm, and I suspect there is a natural inclination for the owners of such companies to elide the distinction between themselves and the companies they own.[2]  But there is a distinction, and it matters in important respects.  *See Korte v. U.S. Dep't of Health & Human Servs.*, 2012 WL 6553996, at *9 (S.D. Ill. Dec. 14, 2012) ("business forms and so-called 'legal fictions' cannot be entirely ignored" in assessing the relationship between corporate entity and owners for purposes of RFRA).  Both Grote Industries, Inc., and its subsidiary, Grote Industries, LLC, have legal identities that are separate from those of the Grotes.  "[I]ncorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163, 121 S. Ct. 2087, 2091 (2001).   Although the corporations' income flows to the Grotes, the corporate form significantly limits the Grotes' liability; the corporations, unlike

---

[1](...continued)
incorporation) *with LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 227-28 (3d Cir. 2007) (finding community center to be exempt from Title VII as religious organization in view of, *inter alia*, its not-for-profit nature, recognition in articles of incorporation and bylaws that its purpose was to "enhance and promote Jewish identity, life, and continuity," presentation of Judaic programming, advisory role of rabbis in center's management, and center's close ties with, and receipt of financial support from, local synagogues).

[2] *Cf. Townley Eng'g & Mfg. Co.*, *supra* n.1, 859 F.2d at 620 (owners of corporation argued that "Townley Company is an extension of the beliefs of Mr. and Mrs. Townley, and for all purposes, the beliefs of Mr. and Mrs. Townley are the beliefs and tenets of the Townley Company.").

the Grotes, have potentially unlimited life spans; and ownership of the corporations may be transferred from the Grotes to others. More to the point, it is Grote Industries that employs over 1,100 people around the world, not the Grotes themselves; it is Grote Industries which, as the employer, sponsors a health care plan for the company's employees; and it is that health plan which is now obligated by the Affordable Care Act and resulting regulations to include contraceptive coverage to the 464 employees who work in the United States. Indeed, as the government points out, the health plan itself is a distinct legal entity. *See* 29 U.S.C. § 1132(d)(1) ("An employee benefit plan may sue or be sued under this subchapter as an entity.").[3] It is worth adding that the Privacy Rule incorporated into the regulations promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") imposes a wall of confidentiality between an employee's health care decisions (and the plan's financial support for those decisions) and the employer. *See* 45 C.F.R. Parts 160 and 164; U.S. Dep't of Health & Human Servs., *Health Information Privacy*, www.hhs.gov/ocr/privacy/hipaa/understanding/index.html (last visited Jan. 27, 2013).

I recognize that the Grote Industries health plan is self-funded, so the additional level of separation provided by an insurance company, which was present in *Korte*, is missing here. *See Tyndale House Publishers*, 2012 WL 5817323, at *13 (finding this to be a "crucial distinction"). My fundamental point remains the same, however: the obligation to cover contraceptives falls not on the Grotes personally but on Grote Industries' health care plan. Furthermore, the money used to fund that plan belongs to the company, not to the Grotes. The owners of an LLC or corporation, even a closely-held one, have an obligation to respect the corporate form, on pain of losing the benefits of that form should they fail to do so. *See*, *e.g.*, *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743 (7th Cir. 2012); *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602 (7th Cir. 2009). The Grotes are not at liberty to treat the company's bank accounts as their own; co-mingling personal and corporate funds is a classic sign that a company owner is disregarding the corporate form and treating the business as his alter ego. *See*, *e.g.*, *Van Dorn Co. v. Future Chem. & Oil. Corp.*, 753 F.2d 565, 570 (7th Cir. 1985) (Illinois law); *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind. 1994). So long as the business's liabilities are not the Grotes' liabilities – which is the primary and "invaluable privilege" conferred by the corporate form, *Torco Oil Co. v. Innovative Thermal Corp.*, 763 F. Supp. 1445, 1451 (N.D. Ill. 1991) (Posner, J., sitting by designation) – neither are the business's expenditures the Grotes' own expenditures. To suggest, for purposes of the RFRA, that monies used to fund the Grote Industries health plan – including, in particular,

---

[3] *But see also Leister v. Dovetail, Inc.*, 546 F.3d 875, 879 (7th Cir. 2008) (noting that although "the plan is the logical and normally the only proper defendant" in a suit for benefits, "in cases . . . in which the plan has never been unambiguously identified as a distinct entity, we have permitted the plaintiff to name as defendant whatever entity or entities, individual or corporate, control the plan").

any monies spent paying for employee contraceptive care – ought to be treated as monies from the Grotes' own pockets would be to make an argument for piercing the corporate veil. I do not understand the Grotes to be making such an argument.

The Grotes consequently are, in both law and fact, separated by multiple steps from both the coverage that the company health plan provides and from the decisions that individual employees make in consultation with their physicians as to what covered services they will use. Any burden imposed on the Grotes individually by the contraception mandate is, as Judge Barker reasoned, "likely too remote and attenuated to be considered substantial" for purposes of the RFRA. *Grote Indus., LLC v. Sebelius*, 2012 WL 6725905, at *5 (S.D. Ind. Dec. 27, 2012) (citing *O'Brien v. U.S. Dep't of Health & Human Servs.*, 2012 WL 4481208, at *5 (E.D. Mo. Sept. 28, 2012) and *Hobby Lobby*, 870 F. Supp. 2d at 1294); *see also Conestoga Wood Specialties Corp. v. Sebelius*, 2013 WL 140110, at *14 (E.D. Pa. Jan. 11, 2013) ("whatever burden the Hahns may feel from being involved with a for-profit corporation that provides health insurance that could possibly be used for contraceptives, that burden is simply too indirect to be considered substantial under the RFRA").

I understand the Grotes' concern – the closely-held corporation of which they are controlling shareholders is funding a plan that must now cover contraceptive services, which are inconsistent with their Catholic beliefs. Although Grote Industries is not a religious employer, the Grotes aver, albeit without elaboration, that they seek to run the company in a manner that reflects their religious beliefs. Whatever else that may mean, I assume that it explains why, to date, Grote Industries' self-funded health plan has not included coverage for contraceptives. Requiring the company to include coverage for contraceptives forces the Grotes to operate the business in a way that deviates from the Catholic values that they otherwise endeavor as business owners to observe.

But in this respect the Grotes are no different from any number of business people who must, in compliance with a variety of statutory mandates, take actions that may be inconsistent with their individual religious convictions. The Grotes have voluntarily elected to engage in a large-scale, secular, for-profit enterprise. As the Supreme Court observed in *United States v. Lee*, "When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity." 455 U.S. 252, 261, 102 S. Ct. 1051, 1057 (1982) (declining to relieve Amish employer of obligation to pay Social Security taxes, despite acceptance of contention that both receipt and payment of Social Security benefits violates Amish faith); *see also Braunfeld v. Brown*, 366 U.S. 599, 605, 81 S. Ct. 1144, 1147 (1961) (statute that criminally proscribed sale of various retail goods on Sunday did not impermissibly interfere with free exercise rights of Jewish shopkeepers, although statute imposed extra cost on Jewish shopkeepers in

particular because their religious faith compelled them to close shops on Saturday: "the statute at bar does not make unlawful any religious practices of appellants; the Sunday law simply regulates a secular activity and, as applied to appellants, operates so as to make the practice of their religious beliefs more expensive").

State nondiscrimination statutes, for example, may require a landlord to rent housing to an unmarried couple despite the landlord's belief that cohabitation outside of marriage is a sin. *See Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937 (Alaska 2004) (declining to overrule *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274 (Alaska 1994)); *Smith v. Fair Emp't & Hous. Comm'n*, 913 P.2d 909 (Cal. 1996); *contra*, *Attorney Gen. v. Desilets*, 636 N.E.2d 233 (Mass. 1994). They may obligate a church-affiliated school – which could have sought the protection of a statutory exemption but had not – to retain a schoolteacher in its employ after she gives birth to a child, notwithstanding a religious belief that a woman with preschool-aged children belongs in the home and not the workplace. *See McLeod v. Providence Christian Sch.*, 408 N.W.2d 146 (Mich. App. 1987). They may forbid the evangelical owners of a closely-held, for-profit company from making hiring, promotion, and discharge decisions based on the marital status and religion of prospective and current employees, despite the owners' belief that they must observe the teachings of God in the conduct of their business, including a Biblical mandate not to work with "unbelievers." *State by McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844 (Minn. 1985). They may require a photography business to photograph a same-sex commitment ceremony, notwithstanding the owners' belief that marriage is a sacred union between members of the opposite sex. *See Elane Photography, LLC v. Willock*, 284 P.3d 428 (N.M. App. 2012), *cert. granted*, 2012-NMCERT-8 (N.M. Aug. 16, 2012). They may oblige a medical practice to provide fertility services to a lesbian couple, notwithstanding the religious objections of one or more of its physicians to doing so. *See N. Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court*, 189 P.3d 959 (Cal. 2008).[4]

In these ways and many others, a business owner complying with statutes of general application may be compelled to employ, transact business with, and otherwise provide

---

[4] Some cases in this line do conclude that application of a nondiscrimination statute can meaningfully interfere with the religious liberties of a business owner. *E.g.*, *McClure*, 370 N.W.2d at 852 (relying on state agency's concession that statute abridged the business owners' religious beliefs). However, the cases also consistently emphasize the importance of an owner's voluntary decision to engage in commercial activity, whether as a reason why any burden imposed by such statutes on their religious beliefs and practices should be viewed as minimal, or as a reason why that burden, even if substantial, is outweighed by the State's compelling interest in eradicating discrimination. *Id.* at 853; *see also*, *e.g.*, *Smith*, 913 P.2d at 928-29; *Swanner*, 874 P.2d at 283; *Elane Photography*, 284 P.3d at 443-44.

goods, services, and benefits to people whose status, beliefs, or conduct are inconsistent with the owner's religious beliefs and practices. In evaluating the burden that such requirements impose on a business owner's religious liberties, one must distinguish between an owner's commercial conduct and his religious beliefs and conduct. Requiring a secular business over the religious objection of its owner to do something in the commercial sphere that is required of nearly all such businesses ordinarily does not require the owner to abandon his religious tenets, to endorse conduct or express an opinion that is contrary to his religious beliefs, or to modify his private conduct as a religious observant. *See Swanner*, 874 P.2d at 283 ("It is important to note that any burden placed on Swanner's religion by the state and municipal interest in eliminating discrimination in housing falls on his conduct and not his beliefs. Here, the burden on his conduct affects his commercial activities."); *McClure*, 370 N.W.2d at 853 (finding that the burden on business owners' religious interests was justified by State's interest in eradicating discrimination: "Sports and Health is not a religious corporation – it is a Minnesota business corporation engaged in business for profit. By engaging in this secular endeavor, appellants have passed over the line that affords them absolute freedom to exercise their religious beliefs.").

The contraception mandate, as applied to Grote Industries, does not compel the Grotes to personally engage in or endorse conduct of which they disapprove on religious grounds: they need not use contraception, speak approvingly of it, or refrain from discouraging the use of contraception by others. *See Conestoga Wood Specialties*, 2013 WL 140110, at *14; *Grote Indus.*, 2012 WL 6725905, at *5-*6; *O'Brien*, 2012 WL 4481208, at *6. All that the mandate requires is that the Grote Industries health plan permit individual employees, in consultation with their physicians, to decide to use FDA-approved contraceptives and pay for the use of those contraceptives. The Grotes know that their company's health plan must cover contraception, and that one or more of their employees may decide to take advantage of that coverage, and that the health plan is therefore subsidizing a practice, by others, of which they disapprove.

To the extent this burdens the Grotes' religious interests, it is worth considering whether the burden is different in kind from the burden of knowing that an employee might be using his or her Grote Industries paycheck (or money in a healthcare reimbursement account) to pay for contraception him or herself. *See Conestoga Wood Specialties*, 2013 WL 140110, at *13; *Autocam Corp. v. Sebelius*, 2012 WL 6845677, at *6 (W.D. Mich. Dec. 24, 2012). The likely response is that in the latter scenario, once a paycheck is handed over to the employee, the money is his or hers to use as desired, and any connection to the Grotes – and thus any burden on their religious interests – is severed. But consider that health insurance is an element of employee compensation. *See* 30 C.J.S. *Employer-Employee* § 176 (Westlaw through 2012); Dana Shilling, LAWYERS DESK BOOK, *Medical Insurance* § 3.07 (2012); *see also*, *e.g.*, *Tatom v. Ameritech Corp.*, 305 F.3d 737, 739 (7th Cir. 2002); *Doe v. Blue Cross & Blue Shield*

*United of Wis.*, 112 F.3d 869, 874 (7th Cir. 1997). How an employee independently chooses to use that insurance arguably may be no different in kind from the ways in which she decides to spend her take-home pay. *See Autocam*, 2012 WL 6845677, at *6. The likeness is easy to see when the employer purchases health coverage from an insurer: once the coverage is purchased and the employee is named as a beneficiary, the employer has conveyed the benefit to the employee, and it is up to the employee and her physician (not to mention the insurer) how she will use that coverage.

The situation may seem different when the employer chooses instead to self-fund the health care plan, in that the employer rather than an insurer is paying the bills and there is thus a more direct monetary link between the employer and whatever medical care that the employee is choosing for herself. But is the difference material? Either way, the employee is making wholly independent decisions about how to use an element of her compensation. *Conestoga Wood Specialties*, 2013 WL 140110, at *13-*14; *Autocam*, 2012 WL 6845677, at *6. And either way, although the employer knows that certain services to which it has religious objections are covered by the plan, it plays no role in an employee's decision whether or not to use those services, it is not the provider of those services (as it might be if it were providing health care through a company-owned clinic), and it is not endorsing those services. *See Cedric Kuschner Promotions*, *supra*, 533 U.S. at 163, 121 S. Ct. at 2091 ("linguistically speaking, the employee and the corporation are different persons, even where the employee is the corporations' sole owner").

The Supreme Court's decision in *Zelman v. Simmons-Harris*, 536 U.S. 639, 652, 122 S. Ct. 2460, 2467 (2002), is, as one academic has pointed out, a helpful reference point in evaluating the nexus between an employer's funding of a health plan and the healthcare decisions an employee makes pursuant to that plan. *See* Caroline Mala Corbin, *The Contraception Mandate*, 107 N.W. Univ. L. Rev. Colloquy 151, 158-59 (Nov. 27, 2012). *Zelman* dealt with an Establishment Clause challenge to a pilot school "scholarship" or voucher program in Ohio. Of the more than 3,700 students who participated in the program during one school year, 96 percent of them used the vouchers to enroll at religious-affiliated schools. 536 U.S. at 647, 122 S. Ct. at 2464. Among other arguments, Ohio taxpayers contended that the program violated the Establishment Clause for two reasons: (1) notwithstanding the private choices made by voucher recipients, the flow of voucher funds to religious schools was properly attributable to the State, such that even if the program had a legitimate secular purpose, it nonetheless had the impermissible effect of advancing religion; and (2) the program gave rise to a public perception that the State was endorsing religious practices and beliefs. Brief for Respondents Simmons-Harris et al., 2001 WL 1636772 at *12, *37-*38. The Court rejected these arguments, emphasizing that the voucher program was one of "true private choice." 536 U.S. at 563, 122 S. Ct. at 2467.

> [W]here a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause. A program that shares these features permits government aid to reach religious institutions only by way of the deliberate choices of numerous individual recipients. The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.

*Id.* at 652, 122 S. Ct. at 2467. The Court added that "no reasonable observer would think a neutral program of private choice, where state aid reaches religious schools solely as a result of the numerous independent decisions of private individuals, carries with it the *imprimatur* of government endorsement." *Id.* at 655, 122 S. Ct. at 2468.[5]

The *Zelman* decision supports an argument that independent decisionmaking by an insured employee and her physician severs the connection between the employer's funding of a health care plan and the use of plan money to pay for contraceptives. I recognize, of course, that because *Zelman* was an Establishment Clause case, it was addressing concerns different from those that the Grotes, as private citizens with protected religious interests, are asserting here. Nonetheless, I think *Zelman* is relevant to the extent it recognizes that the purchase of a good or service is not necessarily attributable to the person who supplies the money, when the decision to make the purchase belongs entirely to another individual. *See Korte v. U.S. Dep't of Health & Human Servs.*, 2012 WL 6553996, at *10 ("Any inference of support for contraception stemming from complying with the neutral and generally applicable mandate is a *de minimus* burden.").

---

[5] *See also Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 10, 113 S. Ct. 2462, 2467 (1993) (providing publicly-funded interpreter for deaf student attending Catholic high school did not violate Establishment Clause: "The service at issue in this case is part of a general government program that distributes benefits neutrally to any child qualifying as disabled under the [Individuals With Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*], without regard to the 'sectarian-nonsectarian, or public-nonpublic nature' of the school the child attends. By according parents freedom to select a school of their choice, the statute ensures that a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents. In other words, because the IDEA creates no financial incentive for parents to choose a sectarian school, an interpreter's presence there cannot be attributed to state decisionmaking. . . .").

Again, the Grotes can and do argue that because Grote Industries' health plan is self-funded, they – through their businesses – are paying directly for contraceptive care rather than handing employees a voucher that they can use as they wish. I would simply add that the decision whether to self-fund a health plan rather than to purchase coverage from an insurance carrier (which would be closer to a voucher) is a decision made by the employer, likely in part or in whole for economic reasons. One effect of that arrangement, voluntarily undertaken by the employer, is that it places the employer financially closer to the employee's healthcare choices. Thus, to the extent the self-funded nature of a health plan is a "crucial" factor in determining whether the plan's mandated coverage of contraceptive care burdens an employer's religious liberties, *see Tyndale House Publishers*, 2012 WL 5817323, at *13, one ought to acknowledge that the self-funding arrangement is one of the employer's making – and possibly one having little or nothing to do with the employer's religious beliefs – rather than the government's. *See Autocam*, 2012 WL 6845677, at *6 & n.1.

*Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 120 S. Ct. 1346 (2000), is a second precedent that should be considered on the subject of funding. At issue in *Southworth* was a segregated activity fee that all students at the University of Wisconsin were required to pay to support various campus services and activities. One portion of that fee was allocated to support the activities of more than 600 registered student organizations, some of which engaged in political and ideological expression. Organizations primarily obtained funding by applying to one of two funds administered by the student government, which reviewed such applications on a viewpoint-neutral basis. Students who objected to this arrangement filed suit contending that funding the student organizations by means of a dedicated, mandatory fee violated their First Amendment right to free speech; they argued that the university was obligated to give them the choice not to fund student organizations which engaged in political and ideological expression that was contrary to their personal beliefs.

In *Southworth v. Grebe*, 151 F.3d 717 (7th Cir. 1998), this court agreed that the fee system violated the student's free speech rights, relying on such compelled-speech precedents as *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S. Ct. 1782 (1977) (union member cannot be compelled to pay service fee used by union to support political candidates and express political views unrelated to its duties as bargaining representative of employees), and *Keller v. State Bar of Cal.*, 496 U.S. 1, 110 S. Ct. 2228 (1990) (although lawyer could be compelled to join state bar association and fund activities germane to association's regulatory mission, he could not be required to fund association's political expression). We observed:

> The students, like the objecting union members in *Abood*, have a First
> Amendment interest in not being compelled to contribute to an organization
> whose expressive activities conflict with one's "freedom of belief." *Glickman* [*v.*

*Wileman Bros. & Elliott, Inc.*], 521 U.S. [457] at [471], 117 S. Ct. [2130] at 2139 [(1997)]. And here, unlike *Glickman*, requiring the students to pay the mandatory student activity fees does engender a crisis of conscience. *Glickman*, 117 S. Ct. at 2130. Finally, in the words of the *Glickman* Court: "compelled contributions for political purposes ... implicated First Amendment interests because they interfere with the values lying at the 'heart of the First Amendment[—]the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State.' " *Id.* at 2139 (quoting *Abood*, 431 U.S. at 234–35, 97 S. Ct. 1782). In essence, allowing the compelled funding in this case would undermine any right to "freedom of belief." We would be saying that students like the plaintiffs are free to believe what they wish, but they still must fund organizations espousing beliefs they reject. Thus, while they have the right to believe what they choose, they nevertheless must fund what they don't believe.

151 F.3d at 731 (footnote omitted).

The Supreme Court unanimously reversed our holding. The Court recognized at the start "that the complaining students are being required to pay fees which are subsidies for speech they find objectionable, even offensive." 529 U.S. at 230, 120 S. Ct. at 1354. It further acknowledged that the students' First Amendment objection to funding such speech followed logically from cases such as *Abood* and *Keller*. *Id.* at 231, 120 S. Ct. at 1355. Yet, the Court was unwilling to require the university to permit students to opt out of funding organizations whose speech they found objectionable. A university could voluntarily elect to grant students such an opportunity, the Court noted, but it was not constitutionally compelled to do so. *Id.* at 232, 120 S. Ct. at 1355-56. The Court did agree and affirm that the University was required to protect its students' First Amendment interests. *Id.* at 233, 120 S. Ct. at 1356. But doing so did not require the University to relieve students of the obligation to pay the fee used to fund objectionable speech, the Court reasoned. Rather, looking to public forum precedents, *id.* at 229-30, 120 S. Ct. at 1354, the Court concluded that "[t]he proper measure, and the principal standard of protection for objecting students, . . . is the requirement of viewpoint neutrality in the allocation of funding support," *id.* at 233, 120 S. Ct. at 1356. The Court explained that, given the university's goal of fostering open discussion by and among students, viewpoint neutrality in funding student speech represented "the justification for requiring the student to pay fee in the first instance and for ensuring the integrity of the program's operation once the funds have been collected." *Ibid.* It would protect students by ensuring "that minority views are treated with the same respect as are majority views," and consequently that all students were given access to the forum of extracurricular student activities, *id.* at 235, 120 S. Ct. at 1357, and by preventing any

erroneous impression that any individual student organization speaks for the university, *id.* at 233, 120 S. Ct. at 1356 (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 841, 115 S. Ct. 2510, 2523 (1995)). As it was stipulated that funding requests submitted by student organizations to the student government at the University of Wisconsin were, indeed, reviewed on a viewpoint neutral basis, the Court concluded that the university's funding system was consistent with the First Amendment. *Id.* at 234, 120 S. Ct. at 1356.[6]

Although *Southworth*, too, may be distinguished from this case, which concerns a religious objection to funding a particular category of medical care, it nonetheless has some relevance to the Grotes' claims. *Southworth* recognizes that the compulsion to fund speech by others that an individual finds objectionable does not invariably constitute a violation of his own right to free speech; rather, so long as one is paying into a fund from which the expression of a variety of viewpoints is funded on a neutral basis, the rights of the individual paying into that fund are sufficiently protected. The Grotes, of course, are objecting to funding contraception, not speech; but what their company is actually required to fund is a health insurance plan that covers many medical services, not just contraception. The obligation to fund a health plan is generally applicable and neutral in the sense that the services that must be covered by the plan have not been chosen on the basis of religion. Moreover, the decision as to what services will be used is left to the employee and her doctor. To the extent the Grotes themselves are funding anything at all – and as I have discussed, one must disregard the corporate form to say that they are – they are paying for a plan that insures a comprehensive range of medical care that will be used in countless ways by the hundreds of U.S.-based employees participating in the Grote Industries health plan. No individual decision by an employee and her physician – be it to use contraception, treat an infection, or have a hip replaced – is in any meaningful sense the Grotes' decision or action. *See Southworth*, 529 U.S. at 239-40, 120 S. Ct. at 1359 (Souter, J., concurring in the judgment) (distinguishing use of activity to fee to "indirectly fund[ ] the jumble of other speakers' messages" from cases in which government "restrict[s] or modif[ies] the message a student wishes to express," "require[s] an individual to bear an offensive statement personally," or compels the objecting individual "to affirm a moral or political commitment").

---

[6] There was an alternative means by which student organizations might seek funding through a student referendum process. The Court noted that "[t]o the extent the referendum substitutes majority determinations for viewpoint neutrality it would undermine the constitutional protection the program requries." *Id.* at 235, 120 S. Ct. at 1357. As the record was not well-developed on this avenue of funding, the Court therefore remanded the case for further exploration of that point. *Id.* at 235-36, 120 S. Ct. at 1357.

The significance of private decisionmaking by the insured employee is worth discussing in one last respect. Heretofore, there has a been a general understanding that an employer, by virtue of paying (whether in part or in whole) for an employee's health care, does not become a party to the employee's health care decisions: the employer acquires no right to intrude upon the employee's relationship with her physician and participate in her medical decisions, nor, conversely, does it incur responsibility for the quality and results of an employee's health care if it is not actually delivering that care to the employee. This litigation seeks in a sense to upend that traditional understanding, by postulating that when a company insures its employees' health care, a company owner indeed is a party to that care, with a cognizable religious interest in what services are made available to the employee.

The obligation to pay for contraceptive coverage is the current hot topic in federal litigation,[7] because the federal contraception mandate is new.[8] But contraceptive care is by no means the sole form of health care that implicates religious concerns. To cite a few examples: artificial insemination and other reproductive technologies; genetic screening, counseling, and gene therapy; preventative and remedial treatment for sexually-transmitted diseases; sex reassignment; vaccination; organ transplantation from deceased donors; blood transfusions; stem cell therapies; end-of-life care, including the initiation and termination of life support; and, for some religions, virtually all conventional medical treatments. If the RFRA entitles the controlling shareholder of a corporation to exclude coverage for contraceptive care from the company's health plan on the basis of his religious beliefs, then, as I noted in *Korte v. Sebelius*, 2012 WL 6757353, at *5, and Judge Barker noted below, *see Grote Indus.*, 2012 WL 6725905, at *6, I can see no reason why coverage for any number of medical

---

[7] By one judge's count, some forty lawsuits have been filed challenging the mandate. *See Catholic Diocese of Peoria v. Sebelius*, 2013 WL 74240, at *1 & n.1 (C.D. Ill. Jan. 4, 2013) (coll. cases).

[8] Parallel mandates applicable to insurers and group insurance plans have existed at the state level for a number of years. Beginning with Maryland in 1998, some twenty-eight States had adopted mandates requiring insurers to include coverage of prescription contraceptives by the time the federal mandate took effect in 2012. *See* National Women's Law Center, *Guaranteeing Coverage of Contraceptives: Past & Present* (Aug. 1, 2012), available at http://www.nwlc.org/resource/guaranteeing-coverage-contraceptives-past-and-present (last visited Jan. 27, 2013); Guttmacher Institute, STATE POLICIES IN BRIEF, *Insurance Coverage of Contraceptives* (as of Jan. 1, 2013), available at http://www.guttmacher.org/statecenter/spibs/spib_ICC.pdf (last visited Jan. 27, 2013). Due in part to these mandates, nine in ten employer-based insurance plans were already covering prescription contraceptives by that time. Guttmacher Institute, FACT SHEET, *Contraceptive Use in the United States*, at 4 (July 2012), available at http://www.guttmacher.org/pubs/fb_contr_use.html (last visited Jan. 27, 2012).

services could not also be excluded from a workplace health plan on the same basis. In part, this is a point that addresses a separate consideration under the RFRA – whether there are reasonable alternatives to requiring employer-sponsored coverage of the objected-to form of care, and thus whether the insurance mandate is the least restrictive means of ensuring access to that care. *See* 42 U.S.C. § 2000bb-1(b)(2). But I think it also helps to place in context the nature of the burden that is being asserted in this litigation. Medical decisions are made in private on an individual basis. Any given medical decision, depending on the nature of the patient's condition, the available treatments, and the circumstances confronted by doctor and patient, might be inconsistent with the religious beliefs of one or more owners of the company that sponsors the patient's workplace insurance. Holding that a company shareholder's religious beliefs and practices are implicated by the autonomous health care decisions of company employees, such that the obligation to insure those decisions, when objected to by a shareholder, represents a substantial burden on that shareholder's religious liberties, strikes me as an unusually expansive understanding of what acts in the commercial sphere meaningfully interfere with an individual's religious beliefs and practices.

These and other issues will be fleshed out as the merits of this appeal are briefed. But the Grotes have not yet convinced me that whatever burden the contraception mandate imposes on the exercise of their religious freedom is a substantial burden, in the sense that it directly affects the exercise of their Catholic faith. *See Conestoga Wood Specialties*, 2013 WL 140110, at *14; *Annex Med., Inc. v. Sebelius*, 2013 WL 101927, at *4-*5 (D. Minn. Jan. 8, 2013); *Grote Indus.*, 2012 WL 6725905, at *5-*6; *Autocam*, 2012 WL 6845677, at *6-*8; *Korte v. U.S. Dep't of Health & Human Servs.*, 2012 WL 6553996, at *10-*11; *Hobby Lobby*, 870 F. Supp. 2d at 1294-96. I therefore do not believe that they are entitled to preliminary injunctive relief pending the resolution of their appeal.

I respectfully dissent.